UNITED STATES DISTRICT COURT
at Boston

from a judgement in
Suffolk Superior Ct.
in Massachusetts
SUCR92-10979

Vao Sok Pro se the habeas corpus
petitioner

versus

Lois Russo respondent superintendent of
SBCC prison in Shirley, MA

## PRO SE PETITIONER'S MEMORANDUM OF LAW IN SUPPORT OF HIS PETITION FOR HABEAS CORPUS

Your pro se petitioner, Vao Sok was convicted by a jury of
first degree murder, rape of a child by force, and kidnapping.
The Supreme Judicial Court for Massachusetts affirmed the
conviction on February 1, 2002.

Petitioner luckily found someone to draft him a collateral
appeal pursuant to Mass. Rules of Crim. Proc. #30, however,
the Suffolk Superior Court denied said collateral attack without
addressing issues, merely a one sentence message- DENIED.
The Supreme Judicial Court also denied the appeal to the single
justice without addressing the issues.  The collateral appeal
was denied approximately around July 2003 but the petitioner
requests this court equitably toll the time limit for filing
habeas petition because he was separated from inmate who drafted
his pleadings, and had to resort to almost smuggling present
pleadings from one end of prison to the other.

2.

   Vao Sok is mentally retarded and this is a case of actual

innocence so equitable tolling should be allowed under three

established exceptions to AEDPA:

1.    Time limit should not toll while petitioner was seeking

collateral review (ineffective assistance of counsel in the

state courts)  <u>Fields v Johnson 159 F3d 914 (1998)</u> .

2.    Time limit should not toll because petitioner has I.Q.

of only 66, speaks primarily Khmer and cannot read English with

any certainty.

> "...mental incompetency also justifies equitable
> tolling at least until a reasonable period of time
> has elapsed after the district court makes a
> competency determination..."

<u>Calderon v. U.S. Dist. Court for the Cent. Dist. of California</u>
<u>163 F3d 530, at 541 (1998)</u> .

3.    This is a case of actual innocence whereas government

conducted DNA analysis then moved in limine to exclude its

own DNA testing AND where confession was obtained by trickery

and was heavily coached when petitioner's story did not match

the facts.   Whereas a DNA anlaysis of petitioner would exonerate

him:

> "Although DNA testing is of remarkably high
> reliability, its value as a forensic tool in
> criminal investigations was not demonstrated
> until 1985 and its use in re-evaluating prior
> convictions was only beginning at the time
> <u>Herrera</u> was decided in 1993.   Yet in just the
> few short years since then, DNA testing has
> established the factual innocence of no fewer
> than 12 inmates on death row, some of whom came
> within days of being executed and all of whom
> have been released.   This alone strongly suggests
> that more than a few people have been executed in

3.

> "...recent decades whose innocence, otherwise
> unapparent to either the the executive or
> judicial branches, would have been conclusively
> established by DNA testing if it had been
> available in their cases."

U.S. v QUinones 196 F. Supp. 2d 416 at 417 (2002)

"The Innocence Protection Act of 2001" which seemingly has
died in committee would require that your petitioner receive
the DNA analysis requested, but in its stead, the petitioner
prays this court give him the relief in that a conditional
writ of habeas corpus issue in that his DNA is fairly tested
and compared to the semen found on the victim's clothing.

The confession is what petitioner was convicted on, but they
used the now infamous trick police use when interogating a
retarded suspect:

"If you admit to it, we'll let you go home in 6 months, but
if you don't, your're going away for life."

Add to that the horrors petitioner witnessed under the Pol
Pot regime of the Khmer Rouge where his father was killed by
the communists and he often saw people taken away by police
and later saw their bodies rotting in the forest.   Petitioner
did not voluntarily give his confession and the confession
was false, AND detectives switched off the tape and coached
him when his story did not fit the facts.

ANd so, the petitioner's habeas coprus petition should be
equitiably tolled and the slight delay in getting it to the
court excused.

4.

**Statement of the case:**

The Massachusetts Committee for Public Counsel Services represented the petitioner both at trial and on direct appeal. After the Massachusetts Supreme Judicial Court affirmed his conviction Feb. 1, 2002, petitioner sought out assistance and no inmate wanted to help him due to the nature of the charges in that a five year old girl had been raped and murdered. He did find someone to assist him eventually but after he was denied by the Suffolk Superior Court and then appealed to the single justice of the Supreme Judicial Court and was denied there, petitioner became separated from inmate who prepared his pleadings.   This is significant because Vao Sok is mentally retarded with an I.Q. of only 66 and his primary tongue is Khmer since he grew up in Cambodia.   The SUffolk SUperior Court and the Supreme Judicial Court ignored petitioner's motions to appoint counsel.

On May 15, 1992, a five year old girl of Cambodian descent named Anmorian Or was kidnapped in front of the building she lived at and brought to a vacant apartment in the same building where she was beaten, raped and partially asphyxiated.   She died four days later from complications due to the aspyxiation attempt.

Semen was found on her underpants along with a solitary pubic hair, (she had none of her own).   The address of this building

5.

was 146 Shirley Ave. in Revere Massachusetts.    It was an
apartment building with eight units.

The police quickly focused their attention on your petitioner
because they learned he had an outstanding rape charge (child)
in Lynn Massachusetts and was out on bail on that charge.
Adding to their suspicians of Vao Sok was that he lived in the
same building as victim and was employed as a handyman in that
building, (his actual duties were to de-lead vacant apartments)
and was one of only a few paople to have a key to the vacant
apartment where the victim had been found, struggling for life.

They took Vao Sok into "protective custody" and administered
a polygraph test with the aid of an interpretor.    They did not
feed him for 48 hours and did not inform him that his lawyer wanted
to be present at questioning, the police refused to allow the lawyer
access.    They manipulated his feeble mind saying that they
would let him go if he admitted he was the one who attacked
Anmorian Or.    Every time his story did not fit, they shut off
the machine and coached him on what to say next.

He was under arrest now.

While being held for the murder, he was aquitted by a jury
in the child rape case in Lynn when the victim's story and her
own inability to identify petitioner became apparrently shakey.
It came out at trial that the victim had been coached and that
the case was extrememly weak.    BUT it was this case that

6.

focused all the suspicion on Vao Sok AND now they had their
confession.

Defense counsel made an interlocutory appeal to suppress
DNA evidence in this case, Com v Vao Sok (and thirteen companion
cases) 683 Ne2d 671 425 Mass 787 (1997). This was an aggregation
of several other defendants in Massachusetts all trying to
suppress DNA evidence. The Massachusetts SUpreme Court ruled
that said DNA tests were admissable in trial as evidence.

What counsel failed to do was to actually read up on DNA
technology and challenge the fact that Center for Blood Research
(CBR) laboratories deviated wildly from established scientific
protocol in analyzing Sok's DNA in that they compared his DNA
and the semen found on the victim against 14,000 Caucasions,
9,000 Negroids, two sub groups of Hispanics totaling 15,000
BUT they did not compare him or suspect to any Asiatic specimens.
Dr. Bing who conducted the testing at CBR then miraculously
produced a data base from China with several hundred donors
and stated with authority that this fills the deficiency.

But it simply is not plausible that China in 1995 would have
the same level of technical sophistication as the United States
AND that miraculously, the Chinese studies targeted the same
three loci on the DNA twisted ladder that the UNited States did.

7.

The prosecutor realized this was a gaping sore and ripe for appeal if he used it to convict so the government motioned in limine to exclude its own DNA evidence.

The petitioner prays this court order a DNA analysis by contemporary standards incorporating the FBI database which catalogs many thousands of Asiatics by either performing fresh testing on the semen found on the victim, or by using the already existing autoradiographs on the three loci already tested and compare them against said FBI DNA database.   The former would be more accurate because nowadays they test at 14 different polymorphic loci, not only three, (polymorphic meaning variable. Most human DNA is the same from person to person.  Only a few loci or rungs on the ladder differ.   The rungs that typically differ are called polymorphic and it is those which are analyzed in a criminal prosecution).

This is significant because from race to race some profound genetic differences are apparent.   For example, large portions of Asiatics have a different amount of roots on their molars than the rest of the human population.   Some diseases only attack one race, (sycle cell anemeia) and many other examples this writer is unaware of.   Race is an essential factor in DNA analysis and there is ample case law suggesting that the suspects race must be adequately represented in the data pool.

8.

Vao Sok was at a distinct disadvantage trying to communicate with trial counsel since his English was so poor.  He tried to explain to his ocunsel and to a forensic psychologist his version of events.   An item of particular significance being how he tried to explain that the day after the girl had been announced as missing, Vao discovered the girl in apartment 3a, the vacant apartment where spare refrigerators and cleaning equipment was stored.   He found her there the morning after she was declared missing, she was alive and he left her there and left the aprtment unlocked.   Afterall, he is retarded and he was out on bail for a child rape in Lynn Massachusetts.

He tried to explain to his counsel that another Cambodian named Vuth had coerced him into providing him with copies of his keys so this Vuth could consort with prostitutes in the vacant apartment and have a place to drink beer with his friends.

He tried to explain this to psychologist Dr. Alan Brown:

> "..what he told me was that he took the
> girl there, that he left her there, and
> that when he left her there, she was alive...'

Testimony of Dr. Alan Brown Vol 10 pg 102-110 Trans.

He did not take the girl there.   This was a miscommunication. He did find her there the next morning.   A DNA analysis would be the definitive way to to dispell any doubt in this case.

Petitioner's own appellate counsel Ruth Greenberg obviously

9.

held nothing but contempt for her client as she badly misquotes

the above statement of Dr. Alan Brown thusly in front of the

Supreme Judicial Court:

> "...that the defendant told him that
> he was there and choked the little kid..."

The misquotes by Dr. Brown due to the language barrier and

the mental retardation of your petitioner are understandable

but what isn't understandable is when appellate counsel Ruth Greenberg

so badly misquotes Dr. Brown as to what amounts to another

confession when no such thing took place.   SUch a bad misquote

is ineffective assistance of appellate counsel all by itself.

Idiots everywhere have a tendency to stumble into difficulties

and are often made patsies by their fellows who see an advantage

in their feeble minds.   Said DNA analysis would dispell any doubts.

Add to this confusing mess the fact that the confession

to the police was obtained illegally.   Petitioner's counsel

went to the police station and demanded to see Sok.   Police

refused him access because they were not done questioning him.

The Massachusetts Supreme Judicial Court said there was no

reversible error because Sok made a knowing and voluntary

confession.   See Vao Sok's affidavit before the Suffolk

Superior Court on collateral appeal,  (appended), It is plain

that police unconstitutionally tricked him into confessing to

something he did not do.   But they were sure they had the right

guy so breaking the rules did not matter.

10.

Counsel informed the police and the D.A. that polygraph test
should cease immediately and he should be granted access to his
client.    These requests were refused.

Trial counsel made a lengthy pre-trial argument to suppress
the ill gotten confession.    WHen it became apparent that
the confession would go in as evidence trial counsel was majorly
ineffective for not putting Sok on the stand to refute the veracity
of the confession.    Afterall, it is no stretch of the imagination
TO KNOW that if the prosecution has a signed confession on
tape, that the ONLY defense left is to put your client on the
stand to refute the truthfulness and explain why he did in fact,
confesss and why the jury should discount it.    Trial counsel
decided to give up or maybe thought it was all for the best
to lock away for life such a person who did this.    Because
of the language barrier between your petitioner and counsel, it
may very well have been he did not understand a word petitioner
said.    Question petitioner by habing him in or by video
conference and you will see that this man cannot communicate
except in broken sentences but he has learned enough English
since his arrest to spell out why he falsely confessed.

In the Appendix of the collateral appeal filed in SUffolk
SUperior Court pgs 59-62 you can see that Vao Sok has been
tested for Intelligence Quotient at 66 making him mentally retarded.

11.

Instead of counsel realizing that DNA could if used properly exonerate his client, he took the cave man approach:  Fire hurt. Fire bad.  If trial counsel had bothered to learn up on the subject he would have realized that the FBI had a database containing a significant amount of Asiatic samples and had this been used for comparison, his client may well have been excluded.

**History of the pleadings:**

Vao Sok was indicted May 28, 1992.  Motions to suppress confession and possible DNA evidence were heard before Hon. Patrick Brady.  The SUpreme Judicial Court heard the interlocutory appeal regarding admissibility of DNA evidence in May 1997 and decided on its admissibility Aug. 25, 1997 <u>Com v Vao Sok</u> <u>(and thirteen companion cases) 425 Mass 787 (1997)</u>  (the thirteen companion cases being other similarly situated defendants faced with DNA evidence).  A jury found Sok guuilty in January of 2000 or thereabouts, (this writer no longer has access to his papers). A motion for new trial was heard by the judge who tried the case, Hon. Vieri Volterra on March 2, 2000.  It was denied and the Supreme judicial Court for Massachusetts affirmed on February 1, 2002 , <u>Com v Vao Sok 435 Mass 743 (2002).</u> Petitioner through a jailhouse lawyer filed a rule 30 motion with the SUperior Court requesting new trial.  That was denied without rendering an opinion by Spurlock RAJ on 9-3-2002.  His motion to appoint counsel was ignored and the SJC also denied relief.

12.

**Issues presented; past and present:**

One direct appeal the issues presented were:

1. Police failed to inform petitioner his lawyer wished to be
present during questioning.

2.  Police officer failed to immediately inform of above issue
in that some significant amount of time elapsed before petitioner
was told his counsel wished to be present.

3. district attorney violated professional ethics by ordering
polygraph to continue after counsel said to make it cease.

4. exclusion from jury of knowledge that petitioner's lawyer
had been trying to gain access to him.

5.  exclusion of additional testimony from expert witness In re
defendant's mental capacity.

6. Ineffective assistance of trial counsel for abandoning
defense of identity mid trial in favor defense of state of mind.

On  petitioner's collateral appeal pursuant to Mass Rules of
Crim. proc #30 for new trial the issues were:

1.  ineffective assistance of trial counsel, failure to put
defendant on the stand.

2.  ineffective assitance of trial counsel, failure to understand
and learn basic scientific concepts In re DNA evidence before trial
so that he could have successfully challenged discrepency.

13.

3.   DNA analysis should be done forthwith by contemporary standards; actual innocence claim.

4.   Ineffective assistance of appellate counsel for not raising these more viable issues that go to actual inncocence while pursuing significantly weaker claims.

Issues presently offered to this court:

1.  Defendant should have been informed of his attorney's attempts to assist him and acces by his attorney should have been granted by the police.

2.   Ineffective assistance of trial counsel failure to put defendant on the stand.

3.   Ineffective assistance of trial counsel for failing to study up on DNA scientific concepts so as to realize where the problem was.

4.   A DNA evaluation should commence forthwith by today's standards or in the alternative, instead of analyzing the 14 standard loci used today, go with the autoradiographs of the three loci tested in 1995 and compare them to the FBI database.

5.  Ineffective assistance of appellate counsel. Appellate counsel may have actually been malicious to defendant petitioner as evidenced by her misquote of Dr. Alan Brown.

14.

CONFESSION WAS INVOLUNTARY IN THAT POLICE REFUSED COUNSEL
ACCESS TO HIS CLIENT

There were lots and lots of things wrong with this confession.
It was obtained illegally but the D.A. and the police said
Yeah Hoo we got ourselves a confession.   SInce the confession
was the topic of a major pre-trial motion to suppress evdience,
and it took place in a Massachusetts Superior Court, the
Massachusetts Humane Practice Rule  should have applied in
that Massachusetts has created a liberty interest under the
5th and 14th Amendments to the United States Constitution.

> "In Massachusetts under our humane practice
> a judge has a constitutional obligation to
> conduct a voir dire examination in the absence
> of the jury where the voluntariness of a confession
> is in issue and to make an affirmative finding
> of voluntariness before the jury are allowed
> to consider it..."

Com v Van Melkebeke 48 Mass App Ct. 364 (1999) 720
Ne2d 834 at 836

But they threw all the rules out the window because it
was a shocking crime- Yee Haw there gonna be a hangin'.
Swirling in rumors throughout Massachusetts courts at the same
time was that defendant's DNA was a match, but it wasn't.
It was two rotted pieces of wood propped up together and the
courts bought it.

The judge didn't voir dire the defendant.  Trial counsel
didn't even think of asking him to.   This is a case were a hapless
fool may be innocent so please be careful.

15.

And Com v Melkebeke is not an abberation.  It is well
grounded in humane practice law in Massachusetts.

> "Our humane practice requires that at
> a preliminary hearing in the absence
> of the jury, a judge must decide whether
> a defendant's incriminating statments
> were voluntary.."

Com v Crawford 429 Mass 60 706 Ne2d 289 at 293 (1999)

Your petitioner was never questioned in any forum if he made
those statements voluntarily or what inducements were made to
him to compell him to say such things.

Indeed our United States Supreme Court has a specific ruling
on confessions produced by promises of "If you admit to it, we'll
let you go in six months, if you don't you'll go away for life."

> "Under Supreme Court and Tenth Circuit
> precedent, a promise of leniency is relevant
> to determining whether a confession was
> voluntary and depending on the totality of
> of the circumstances, may render a confession
> coerced.."

Clanton v Cooper 129 F3d 1147 (C.A. Okla. 1997)

Why else do you think the police wouldn't let counsel attend
to the petitioner?  Because counsel would have told him, "look
Vao, these promises are not true..  I advise you not to say
anything at this time."

The confession was obtained illegally but all the courts
involved have been willing to look the other way due to the whispers
that DNA evidence shows this is the right guy.  But it doesn't.
And our courts have prescribed a test to see if a confession was
voluntary.  Does the instant case match up?

16.

>"The test for determining the voluntariness
>of a confession is "whether the confession
>was extracted by threats, violence, or direct
>or implied promises" to such an extent that
>defendant's will was overborne."

U.S. v Jacobs 97 F3d 275 at 279 (1996 (Ark.) __and cases cited__.

Had counsel been permitted to access his client, this illegal confession could never have been hatched.    Police had a duty to once they realized suspect was retarded to allow counsel in to see him.    But they knew he had an outstanding child rape charge in Lynn Massachusetts.    So of course, the natural supposition was that this was definitely the man who did this also.    Yet Sok was aquitted by a jury on the Lynn rape charge. It was a case that was directed by overzealous investigators. Likewise here in the instant case.    The requested conditional grant of The Writ ordering the DNA analysis is not such an outrageous demand on our system.    It may very well be that only a re-tabulation of valid statistics is all thats necessary, but certainly a test of the fourteen common polymorphic loci that is now used today wouldn't overburden the budget of what-ever agency is left with the bill.

Considering that people convicted in our courts of this type of heinous crime live the most miserably of all the prisoners because of the natural abhorence, certainly it is enough to warrant a new look at this case?

All counsel had to do was carefully question his client.

17.

ONCE CONFESSION WAS ALLOWED TO STAND COUNSEL HAD NO CHOICE
BUT LET PETITIONER TAKE THE WITNESS STAND IN HIS OWN DEFENSE.
He did not and was therefore, ineffective

After the motion to suppress the confession was lost, counsel
should have realized that the only way to win the case was to
put petitioner on the stand to refute the confession.    There
was no other defense and petitioner had a plausible excuse as to
why he made a false confession.    Counsel's failure in this
respect deprived the petitioner of his only avenue of defense.

> "To merit habeas relief on claim of
> ineffective assistance of state trial counsel
> petitioner must show both that counsel's
> performance was deficient and that it fell
> below objective standard of reasonable
> competence, and that deficient performance
> so prejudiced defense that outcome of trial
> was un-reliable and there was reasonable probability
> that, but for counsel's performance, result of
> trial would have been different."

Lavernia v. Lynaugh 845 F2d 493 (1998)

To determine if counsel meant as trial strategy to advise his
client not to take the witness stand, think about the fact that
the confession on tape was there for the jury to hear and the
pictures of the dying victim were there for them to look at.
Clearly, counsel had a duty to put his client on the stand.
It may not have been enough to put petitioner on the stand,
afterall, a signed and taped confession is a dead bang winner
for the prosecution, but it was the only thing to do.    He did not.

18.

In order to present a viable defense, counsel should have advised his client to testify.

> "The fact of the matter is that a defendant who does not take the stand does not in reality enjoy the presumption of innocence."

Poe v U.S. 223 F. Supp 173, at 177 quoting WIlliams, The Trial of a Criminal Case, 29 N.Y.S. Bar Bull 36 42 (1957) Poe being a 1964 case

Poe, in general deals with a similarly situated defendant who had counsel uncertain as to the law.

> "The right to testify is also found in the compulsory process clause of the 6th Amendment which guarantees the defendant the right to call witnesses in his favor, a right that is guaranteed in the criminal courts of the states by the 14th Amendment....
>
> "The opportunity to testify is also a necessary corollary to the 5th Amendment guarantee against compelled testimony."

Rock v Arkansas 107 S. Ct. 2704 at 2709 (1987)

> "Further, we noted that the first prong of the Strickland test, (for ineffective assistance) would be met if defense counsel refused to accept defendant's decision to testify and would not call him to the stand.."

Nichols v Butler 953 F2d 1550 at 1553 (1992)

The Commonwealth's test for ineffective assistance is also met if the Strickland test is met. The petitioner claims a right to the Writ under the 5th, 6th, and 14th Amendments to the UNited States Constitution.

19.

TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO LEARN ABOUT
THE DNA EVIDENCE AVAILABLE AND PRESENT A DEFENSE

As previously stated the Commonwealth  motioned in limine
to exclude its own DNA evidence.  That alone should send up
a red flag to the court.  Counsel obviously did not have even
a smattering of knowledge about DNA otherwise he would have
picked up on the fact that Asiatics were excluded from the
database that included 14,000 Caucasions, 9,000 Negroids and two
sub groups of Hispanics totalling 15,000.   This is a glaring
bad science problem that even a lay person totally unfamiliar
with DNA analysis can see is faulty.

At the time of trial the FBI possessed a database with a
substantial Asiatic complement.   Instead of foundering with
the dubious report Dr. Bing from CBR (a laboratory which has
closed its doors) which he claimed to have received from China
counsel should have requested comparison with the FBI database.
It is extremely doubtful that China in 1995 had the same level
of sophistication in DNA technology as the UNited States and
even more unlikely that the study targeted the same three loci
on the DNA "ladder".   Counsel let this wizz past the goalie
because he had done little or no preparation on the science
involved.   Had he done his homework counsel could have insisted
on the more logical comparison that could have exonerated his
client.

20.

Of course it will be a disgrace if, after all of this work by this writer, that petitioner had been lying and was in fact, the donor of the semen found on the victim.    This writer would be thoroughly disgusted.

But bear with the petitioner's claims and indulge him in a test which has gotten a lot more affordable in recent years. It would set no dangerous precedent to allow such a test or to order the lower courts to fund said DNA analysis.

Many times this writer had doubts about the veracity of the petitioner but to be honest, his blank face betrays no lying tongue.    It would ease this writer's conscience if said DNA test were done because this fellow is going to be treated very badly for the rest of his life in prison and if he is innocent, this writer wants his conscience clear that he did what he could to establish petitioner's innocence.

Appointing counsel would be a great and generous first step and this case certainly warrants it.    As things stand now, his pleadings have to be smuggled to him on the other side of the prison because MCI SHirley supermax Souza Baranowski is so compartmentalized and present policy so dampening, that it is almost impossible  to meaningfully assist another inmate with his pleadings.    Everywhere inmates travel in Souza Baranowski they are patted down and questioned as to the nature of the things they are carrying, often resulting in inappraopriate confiscation of said materials.

21.

> "To determine the frequency with which
> alleles shown on a test appear in the population,
> one must have gathered and maintained parallel
> DNA information in a database.  Obviously,
> there will be a question whether the data
> base is appropriate, both generally and specifically
> as applied to a defendant.."

Com. v. Curnin 565 Ne2d 440 at 444 (1991)

> "Most DNA testing uses three of more different
> probes to examine each DNA sample with each
> probe designed to link to a different allele.
> **All testing laboratories do not, however,
> probe for the same polymorphic alleles....**

> "..the relevant population is determined by the
> **race** of the defendant...

> "Forensic DNA laboratories have compiled
> data bases for the frequency of particular
> alleles **in each race** by taking DNA prints
> from a number of people in that race
> and calculating the percentage of people
> in which each allele appears."

Curnin, supra at 447 and 448

SO it is plain and unlikely that some obscure laboratory in
China of the same level of techinical sophistication as the
United States in 1995 also tested the same three polymorphic
loci in their studies.  Quite plainly, the people involved
in making the govenrment's case against Vao Sok figured they
had a confession so who cares if they gloss over any holes
in their case.

Dr. Bing of CBR laboratory in Boston intitially reported
his results without any Asiatics in the database.  Then he
magically made the missing data appear fresh from China.

22.

> 'The FBI estimated that, when considered against
> the data base of 200 Caucasions, the probability
> was four million to one that the DNA of an
> individual selected at random from the the
> general Caucasion population would match
> the DNA found on the complainant's clothing.
> When considered against the data base of
> 700 Caucasions, the probability of a random
> match dropped to 2.4 million to one."

Com. v Lanigan 596 Ne2d 311 at 312 (1992)

So it is plain that the early forensic pioneers in DNA

science relied upon faulty statistical calcualtions if as in

the Lanigan case, the probability changed from 4 million to

one, to 2.4 million to one, when increasing the load of the data

base.   In perfect science, the number would not have changed

perceptibly.   But DNA scientists are much more advanced now

than in 1995 when Vao Sok's DNA was compared..

Yet even back when Vao Sok's DNA was compared, an adequate

data base was already in existence.   The FBI at that time had

a DNA database including large numbers of Asiatics.

> "For the purposes of DNA testing, the FBI
> CALCUALTES ALLELE FREQUENCIES FOR Caucasion,
> Black, and Oriental populations..."

Lanigan, supra, at 318

This same scientific point has been stressed in numerous

Federal courts as well,

> "Underrepresentation of persons of like
> ethnicity in the profile data bases and questionable
> assumptions of allelic independence may inflate
> the odds against a random match with the defendant's

23.

> "..sample. In such a situation the jury may
> be ill suited to discount properly the probative
> value of DNA profiling statisitics."

U.S. v. Chischilly 30 F.3d 1144 at 1157 (1994)

So it was a major error of counsel not insist to that his

client be subjected to a fair and accurate comparison.

Even if this court would deem that a fresh DNA analysis on

the semen stain on the victim's underwear was either too expensive

or not possible due to destructive testing previously done,

at least have a DNA statistician compare the existing three

autoradiographs against the spoken of data base.  It would

be eminently more fair to test anew at the 14 prescribed loci

of modern DNA science, but the petitioner is lacking power,

funding and understanding to bring any sort of testing to bear.

> "The frequency of a homozygous 4.2/3
> at the DQA1 site varies from a low of one
> in 1,000 in the Caucasion population, to one in
> 100 in the African American population, to as high as
> one in 83 in the hispanic population..."

Com. v McNickles 753 Ne2d 131 at 145 (2001)

SO itis plain that there is a huge genetic difference at

polymorphic sites from race to race and in this case, a

miscarriage of justice may have accrued due to overzealous state

and local police who honestly believed they had their man and

put on blinders to elements of their cases against Vao Sok

that did not fit.

24.

## PETITIONER SHOULD BE AFFORDED A DNA ANALYSIS BY CONTEMPORARY STANDARDS

Whether or not the petitioner has presented a compelling enough case of probable innocence to warrant a contemporary method of DNA analysis be perfoomed upon the forensic evidence the court knows.

It would be the definitive method of dispelling any doubt in this case and the petitioner prays this court grant a conditional Writ in that the semen on the victim be fairly compared to foresaid data base.

> "Indeed, the success of DNA testing in uncovering the innocence of death row defendants has itself helped spark re-investigation of numerous cases as to which DNA testing is unavailable or irrelevant but as to which other techniques can be applied.  Partly as a result, in just the past decade, at least 20 additional defendants who had been duly convicted of capital crimes and were facing execution have been exonerated and released."

U.S. v Quinones 196 F. Supp. 2d 416 at 418 (2002)

All of petitioner's other issues could be swept aside if only this court would make necessary inquiry into said comparison.

## APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE THESE MORE VIABLE ISSUES

Apppellate counsel obviously loathed her client.  Attorney Ruth Greenberg badly misquotes a defense witness to the extent

25.

that she invented a second confession that never took place.
When she argued petitioner's case before the Massachusetts
Supreme Judicial Court she misquoted defense witness Dr. Alan
Brown thusly:

> "..that the defendant told him that
> he was there and choked the little kid."

But here is what Dr. Alan Brown actually said:

> "..what he told me was that he took the girl
> there, that he left her there, and that
> when he left her there, she was alive.."

Testimony of Dr. Alan Brown Vol. 10 pgs 102-110 Trans.

What Vao Sok had actually tried to convey with his poor
English to Dr. Brown was that he discovered her there the next
morning and therefore the left the door unlocked, being afraid
of being further involved and a shadowy man named Vuth of
Cambodian descent had strongarmed him into copying his keys
so he would have a place to consort with prostitutes and drink
beer.

Counsel was ineffective for not raising the clearly more
viable issues of:

1.    Ineffective assistance of trial counsel, failure to put
petitioner on the stand.

2.    Ineffective asistance of trial counsel, failure to properly
assess the DNA evidence, and secure a fair comparison.

26.

3.  Failure to request a modern DNA analysis by already existing
standards.    This should have been the gravamen of the petitioner's
direct appeal.

> "Deficient performances may be established if
> habeas petitioner shows that his appellate counsel
> ommitted significant and obvious issues while
> pursuing issues that were clearly and
> significantly weaker and the comparison of ommitted
> and included arguments on appeal is not to
> be performed in a vacuum, meaning that ommitted
> claims must have some positive merit; however,
> it need not be assured that ommitted claim
> would have prevailed had it been presented."

Grady v. Artuz 931 F Supp 1048 (

> "In order to be entitled to habeas  corpus
> relief on grounds of ineffective assistance of
> counsel, petitioner must show not only that
> counsel's performance was deficient, but also
> that deficient performance prejudiced defense."

U.S. v Smith 915 F2d 959 (1990)

Just the misquote of Dr. Alan Brown by itself would be
a prima facie case that his appointed appellate counsel loathed
her client and would therefore be ineffective in any capacity.

This habeas petitioner relvolves about the requested DNA
comparison.    It would be good law either way if this court
granted the conditional Writ because in our jurisdiction,
there are a number of wrongly convicted defendants rotting in
jail for crimes they did not commit while the Commonwealth refuses
to DNA test the evidence and then, even further, seeks to block
it from reaching the court if the wrongly convcited defendant

27.


manages to somehow raise the thousands of dollars necessary to
hire a lawyer and test the forensic evidence with DNA analysis.
This jurisdiction needs good law in this avenue.   Look at
all the recent exonerations in Massachusetts over the past
9 years where wrongly convicted defendants wasted as much as
34 years in prison.   ANything which sets the speed for this
type of post conviction enquiry is badly needed.

   Wherefore, the conditional Writ should be granted and the
DNA analyzed by contemporary standards.



                              respectfully submitted,

                              *x* _Vao Sok_
                              Vao Sok Pro se
                              Inmate # W65330
                              Souza Baranowski prison
                              Box 8000
                              Shirley, MA 01464



COMMONWEALTH OF MASSACHUSETTS


Suffolk, ss,                                    Superior Court
                                                Criminal
                                                SUCR 92-10979


                    Commonwealth

                        v.

            Vao Sok, (presently Pro se)



PRO SE DEFENDANT'S AFFIDAVIT PURSUANT TO MASS RULES

OF CRIMINAL PROCEDURE No. 30

1.    My name is Vao Sok, I am the convicted defendant
in the above captioned case.

2.    The Supreme Judicial Court of Massachusetts, in
February of 2002, affirmed my convictions for murder in
the 1st, rape, and kidnapping.

3.    Attorney Ruth Greenberg was my appointed appellate
counsel.

4.    Attorney Elliott Weinstein was my appointed trial
counsel.

5.    Honorable Vieri Volterra was the judge who tried
the case.

6.    The police focused their attention upon me in this
matter upon learning that I had a copy of a key to the
apartment where the victim was discovered and also because
the victim was sexually assaulted.  I had, at the time,
an outstanding charge against me in another county for
rape.   The two cases involved very young females who
were Cambodian.

7.    I was aquitted of the outstanding rape charge while
awaiting trial on the second one because lab results did
not point to me and the testimony of the witnesses, (all
young children) differed dramtically from the embellishments
of police and relatives involved.

8.    I have very low intelligence and have had, in my



Affidavit page 2.

8. (cont.)   whole life, less than three months of school.

9.   The Commonwealth's entire case was built upon my confession of May 21, 1992, at the then Southboro old state police barracks on the Mass. Pike.

10.   I was born in Cambodia and experienced many terrors and tortures and forced labor at the hands of the Khmer Rouge.   I made my way to the border of the country with my mother to a refugee camp.   My father was killed by the soldiers.   From there I made my way to the Phillipines and then the United States.

11.   It was a combination of being unduly terrified of law enforcemnt officials (from my terrors in Cambodia) and my I.Q. of only 66 that I was easily manipulated by police to confess to a crime I did not commit.

12.   The victim lived at, and was discovered in a vacant apartment in the same building.   She lived with her parents on the second floor of the building, (she was five) and the vacant apartment was on the first floor.   The landlord, the defendant, a previously fired worker, and a man from Thornton St. in Revere named Vuth all had a key to the vacant apartment, labeled as 3A.

13.   The man from Thornton St. in Revere named Vuth was given a key by me and he copied it and the key to apartment 9 on the second floor.   He used the vacant apartments as a place to bring prostitutes.

14.   I speak very poor English now, and at the time of the killing, I was very poor in my understanding of English.

15.   I was terrified to tell the police of Vuth and was having a great deal of difficulty sorting things out when I spoke to them on May 17th, 19th and 21st. 1992.

16.   On May 21st 1992, when I confessed, the police had not let me eat for about 48 hours and they kept telling me if I confess then I would go home in six months or a year, but if I don't, then I go away for life.   They would coach me on what to say with the tape machine off, then switch it on and erase what I said if it did not match what they wanted to hear.   When I told them I hit her, (the victim) they switch off the machine and scold me saying, we want you to say you choked her.



Affidavit page 3.

17.    I was interviewed extensively through an interpretor
r.a~by Dr. Alan Brown who testified at my trial.    Appellate
counsel Ruth Greenberg erroneously attributed a statemnt
to Dr. Brown in her brief on the solitary issue of ineffective
assistance of counsel as follows;
"..that the defendant told him that he was there and
choked that little kid."
     In reality, Dr. Brown testified:"that he had taken the
victim to the apartment (3A) and had left her there alive".

18.    Due to clumsiness of conversing on particular details,
there had been a miscommunication between myself and Dr.
Brown.    I had told him that I had entered apartment 3A
on Saturday morning early, (the day after the abduction)
and discovered her there.    I was terrified and told no
one and witheld this information until speaking with Dr.
Brown.    I told him that I left her there alive, and left
the door unlocked.    I was not the one who brought her
there.

19.    A week prior to the attack on the victim, I witnessed
Vuth of Thornton Street slap the victim very hard.

20.    The two Cambodian/English interpreters the police
used were hostile to me and in collusion with the police.
They obviously believed I was the perpetrator because
of the outstanding child rape case against me in another
county.    They were very eager to assist in convicting me.

21.    My attorney for trial did not explain to me that
the only way to conquer a false confession was to take the
stand myself.    My appointed counsel have no doubt believed
I am guilty of this heinous crime and only made a show
of a defense.    I tried my very best to explain to them
why I came to confess to a crime I did not commit and it
either fell on deaf ears, or was totally misunderstood.

22.    The Commonwealth knew the confession was the whole
case, having made a mess of the DNA testing.    In the motion
to suppress the confession every single police witness
had convenient amnesia when questioned about anything that
would suggest the confession was involuntary.

     I hereby swear that this whole affidavit is the
truth to the best of my knowledge, under pain and penalty
of perjury.

Date: 6-18-02        Notary Public

Vao-Sok

Vao Sok Pro se
Box 8000
Shirley, MA 01464

MY COMMISSION EXPIRES
10/20/06

91.